**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BTG INTERNATIONAL INC., | |
| *Plaintiff*, | CIVIL ACTION |
| v. | NO. 15-04885 |
| BIOACTIVE LABORATORIES and KENNETH E. DARNELL, | |
| *Defendants*. | |

**PAPPERT, J.**                                                    **JUNE 28, 2016**

## MEMORANDUM

BTG International Inc. ("BTG") sued Bioactive Laboratories ("Bioactive") and Kenneth Darnell ("Darnell") (collectively "Defendants") for abuse of process after Defendants filed an *inter partes* petition with the Patent Trial and Appeal Board challenging one of BTG's patents. BTG, a manufacturer of anti-venom medication, alleges that Defendants' purpose in filing that petition was not to challenge the validity of the patent, but instead to extort BTG for money and other forms of relief.

Before the Court are Defendants' motion to strike portions of the amended complaint and dismiss for failure to state a claim. Defendants contend initially that the Court lacks personal jurisdiction over them. They also argue that in the event that the Court finds it has personal jurisdiction, it should strike the portions of the amended complaint that disclose settlement discussions in the *inter parties* review proceeding because such communications are barred by Federal Rule of Evidence 408. Defendants argue that once such portions of the complaint are stricken, the amended complaint should be dismissed for failure to state a claim. Even if the Court declines to strike and dismiss the amended complaint for failure to state a claim,

1

Defendants argue that the Court should grant its motion to dismiss because the *Noerr-Pennington* doctrine immunizes them from liability.  For the reasons that follow, the Court denies the motion in all respects.

## I.

BTG is a pharmaceutical manufacturer whose principal place of business is in West Conshohocken, Pennsylvania.  (Am. Compl. ¶¶ 9–10, ECF No. 14.)  One of its products is an anti-venom medication, CroFab Crotalidae Polyvalen Immune Fab (Ovine) ("CroFab"), which is sourced from rattlesnake venom.  (*Id.* ¶¶ 10–11.)  BTG owns a patent for CroFab, identified as United States Patent No. 8,048,414 (the "'414 Patent").  (*Id.* ¶ 3.)

Darnell is a rattlesnake venom extractor and merchant who operates his business through Bioactive, a sole proprietorship whose principal place of business is at Darnell's home in Gordon, Alabama.  (*Id.* ¶¶ 12–13.)  He is a patent lawyer,[1] though has worked as a rattlesnake venom extractor and merchant for the past 35 years.  (*Id.* ¶ 14.)  Darnell and Bioactive do not own any patents, manufacture anti-venom medication or compete with BTG in the anti-venom industry.  (*Id.* ¶ 14.)

Darnell has promoted the medicinal properties of rattlesnake venom and has specifically invoked BTG's name and the CroFab product as part of his "campaign to oppose rattlesnake conservation laws that will hurt his venom business."  (*Id.* ¶ 22.)  In particular, Darnell opposed laws banning "rattlesnake roundups" and "efforts to place the eastern diamondback rattlesnake on the threatened species list."  (*Id.* ¶¶ 23–24.)  According to BTG, rattlesnake roundups are "like bloody state fairs at which rattlesnakes captured by locals[,] sometimes by gassing . . . are

---

[1] Though the amended complaint states that Darnell is a "patent lawyer," Darnell stated in a previously filed declaration and his counsel stated during oral argument that he is a patent agent with the United States Patent and Trademark Office.  (Darnell Decl. ¶ 9, ECF No. 6-3; Oral Arg. 19:10–13; 106:24–25, ECF No. 28.)

brought in for a bounty, milked for venom, and then usually butchered for their meat and skins."[2]
(*Id.*)  In his campaign against conservation laws, Darnell stated "to the press and others" that: (1)
95-percent of the world's supply of western diamondback rattlesnake venom used to make anti-
venom medication is collected at Texas rattlesnake roundups; (2) the venom collected at the
roundups is used to create CroFab; and (3) if Texas lawmakers continue to regulate the roundups,
"we may see emergency rooms with people waiting for treatment but no medication to treat
them."  (*Id.* ¶ 26.)

 BTG sought to distance itself from Darnell's anti-conservation efforts because it "did not
do business directly with [Darnell or Bioactive]."  (*Id.* ¶ 25.)  BTG opposes inhumane venom
extraction methods and stated to the Texas Parks and Wildlife Department ("TPWD") in 2010
that "venom [for CroFab] is produced under strict laboratory protocols and outside venom
sources cannot be used."  (*Id.* ¶¶ 25, 27(a).)  BTG stated that it "never purchases snakes from
snake farmers, from private collections, or at rattlesnake roundups."  (*Id.* ¶ 27(a).)  It maintained
that "Darnell has repeatedly and inaccurately invoked BTG's name and its purported need for
Defendants' venom to produce CroFab [as a way] to bolster his opposition to snake conservation
measures."  (*Id.* ¶ 27(c).)

 In 2014, BTG learned that some of the venom used to produce CroFab had been
indirectly supplied by Bioactive through Biotoxins, an intermediary located in Florida.  (*Id.*
¶ 27(d).)  BTG maintained that it opposed rattlesnake roundups and gassing.  (*Id.* ¶ 27(e).)  It
amended the terms and conditions for its purchase orders to state that "no venom sold to BTG
has been produced or acquired at snake roundups, by gassing . . . or sourced from entities or

---

[2] "Gassing" is a method whereby collectors "introduc[e] gasoline and/or the associated vapors into winter
dens to drive snakes from the den to be harvested."  TEXAS PARKS & WILDLIFE, SNAKE HARVEST WORKING GROUP
FINAL REPORT 1 (2016), http://tpwd.texas.gov/huntwild/wild/wildlife_diversity/nongame/media/TPWD-SHWG-
Report.pdf.

individuals who are snake farmers, private collectors, or who engage in gassing or . . . any other harmful or inhumane methods of venom collection." (*Id.*)

Darnell claimed that BTG's statements were defamatory and damaged his business. (*Id.* ¶ 28.) He threatened to sue BTG in three letters that he and/or his lawyer sent to various BTG officers or employees. (*Id.* ¶ 28.) Darnell sent the first letter on February 26, 2014 to Matthew Gantz at BTG's office in Pennsylvania, alleging that BTG has been "profoundly dependent" on various venoms extracted by Darnell since 2008. (*Id.* ¶ 29.) The letter stated that BTG's "untrue statements constitute libel and are unacceptable," and that BTG "will be held to account" for its actions. (*Id.*)

Darnell and Bioactive's attorney, James R. Bowles, sent a second letter on September 15, 2014 to Louise Makin, the Chief Executive Officer of BTG's parent company in London, BTG International Ltd. (*Id.* ¶ 30.) Bowles stated in the letter that BTG has been "determined to destroy" Defendants' reputation and that "[t]he reckless disregard for the truth on the part of BTG has diminished and severely affected [ ] Darnell's ability to produce Western Diamondback venom." (*Id.* ¶ 30(b).) Bowles asserted that because of BTG's "libelous and slanderous actions," Darnell has "suffered loss of reputation, has been held up to untold scorn and ridicule and has suffered substantial financial loss even as he continued to contribute to BTG beneficial venom inventories and actually facilitating the efforts of BTG to produce the CroFab product." (*Id.* ¶¶ 30(e), (g).) Bowles stated that public disclosure of the matter would "be extremely embarrassing . . . and will be of interest to the *Financial Times* of London." (*Id.* ¶ 30(j).)

Bowles sent a third letter on October 7, 2014 to Neil Payne of BTG at BTG's Pennsylvania office. (*Id.* ¶ 31.) Bowles wrote that "[b]efore proceeding with legal action, I would like to know if BTG is interested in discussing a possible settlement of . . . Darnell's

4

claim." (*Id.* ¶ 31(c).)  Darnell also informed third parties of his intent to sue BTG and requested

emails from the TPWD related to his threatened lawsuit.  (*Id.* ¶¶ 32–33.)

       Darnell and Bioactive never sued BTG for defamation, libel or slander.  (*Id.* ¶ 34.)

Instead, on May 29, 2015, Defendants filed an *inter partes* review ("IPR") petition with the

Patent Trial and Appeal Board ("PTAB") against BTG challenging the CroFab '414 Patent.  (*Id.*

¶ 34.)  According to BTG, IPR is a trial proceeding "before the PTAB to review the patentability

of one or more claims in an issued United States patent."  (*Id.* ¶ 35.)  The proceeding is designed

to "provid[e] quick and cost effective alternatives to litigation," not "tools for harassment."  (*Id.*

¶ 36 (citing H.R. Rep. No. 112–98, pt. 1, at 48).)

       BTG alleges that the IPR petition "is virtually identical (including original typos) to an

IPR petition challenging BTG's '414 Patent filed by a BTG competitor . . . and terminated

pursuant to a settlement."  (*Id.*)  After receiving the petition, counsel for BTG called Defendants'

counsel to ask "what his clients were trying to accomplish."  (*Id.* ¶ 40.)  Defendants' counsel

"responded with words to the effect of 'well, we simply want to benefit the public by taking

down a bad patent' and then laughed—making it clear and obvious to BTG that [D]efendants'

IPR petition has nothing to do with the '414 Patent claims and everything to do with using the

expense and inconvenience of defending an IPR proceeding to extort money damages and other

redress from BTG."  (*Id.*)  BTG also claims that approximately one year prior to initiating the

IPR proceeding Darnell stated that he "ha[s] no information concerning the validity of the BTG

patent in question."  (*Id.* ¶ 39.)

       BTG alleges that "the extortionate nature of the IPR proceeding is further evidenced by

the terms of a "Proposed Settlement Term Sheet" (the "Proposed Settlement"), which

Bioactive's counsel sent to BTG's Pennsylvania office on June 15, 2015.  (*Id.* ¶ 41.)  In

exchange for discontinuing the IPR action, the Proposed Settlement requested the following from

BTG:

1. Issuance of [a] public press release from BTG's website announcing non-confidential details of settlement between [Bioactive] and BTG, including recognition of Ken Darnell and value of venom products offered by [Bioactive] in connection with CroFab product;

2. BTG shall make a one-time lump-sum [*sic*] to [Bioactive] in the amount of $3.5 [m]illion;

3. Mutual worldwide covenant not to sue for 15 years by and between [Bioactive] and BTG (and their affiliates) with the exception of any potential claims arising from this settlement agreement;

4. Agreement by BTG to retain a clinician to be mutually selected by the parties for purposes of improving/replacing current CroFab product in order to demonstrably reduce the effect of recurrent coagulopathy;

5. Agreement by BTG to enter into a supply agreement with [Bioactive] wherein [Bioactive] will supply a minimum of 1000 [*sic*] grams of each of *C. adamateus* venom and *C. atrox* venom annually between and including calendar years 2016 and 2028 at a guaranteed cost to BTG of $150/gram of *C. atrox* venom and $300/gram of *C. adamanteus* venom for the term of the contract[.]

(*Id.*, Ex. F.)  BTG alleges that the Proposed Settlement "makes no reference to any of the

specific claims of the '414 Patent, and does not seek to modify any claims of that Patent as a

compromise to sustain the validity of the '414 Patent—which would be a legitimate object of a

settlement demand in a real, non-sham IPR proceeding."  (*Id.* ¶ 43.)

On December 14, 2015, BTG's counsel sent a letter to the Court stating that the PTAB

denied Defendants' IPR petition because it was "not persuaded that [Bioactive Laboratories] has

established a reasonable likelihood that it would prevail on any of its various challenges."  (Pl.'s

Dec. 14, 2015 Letter, ECF No. 22 (internal quotation marks omitted).)  Defendants responded

with a letter to the Court on January 15, 2016 stating that it had requested rehearing with the

PTAB.  (Defs.' Jan. 15, 2016 Letter, ECF No. 24.)

BTG refused the Settlement Proposal and filed this lawsuit against Defendants on August 28, 2015.  (ECF No. 1.)  BTG filed an amended complaint on October 13, 2015 alleging a common law abuse of process claim and seeking compensatory damages for "litigation and operational expenses and other damages."  (Am. Compl. ¶ 48.)  In its amended complaint, BTG alleges that Defendants' petition is a "sham, meritless, and copycat."  (*Id.* ¶ 38.)  It claims that that Bioactive and Darnell are using the IPR proceeding "as a threat and a club to extort and coerce millions of dollars of alleged compensatory damages" from BTG, and are "abusing the IPR process primarily to accomplish" that goal.  (*Id.*)

On October 30, 2015 Defendants filed a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rules of Civil Procedure ("F.R.C.P.") 12(b)(2), and in the alternative to strike, pursuant to F.R.C.P. 12(f), the portions of the amended complaint that mention the Proposed Settlement.  (Defs.' Mot. to Strike and Dismiss ("Defs.' Mot."), ECF No. 16.)  They also contend that if the Court exercises jurisdiction and strikes the references to the Proposed Settlement, the amended complaint should be dismissed for failure to state a claim pursuant to F.R.C.P. 12(b)(6) and because they are immune from liability under the *Noerr-Pennington* doctrine.  (*Id.* at 9–17.)

Defendants assert that Federal Rule of Evidence ("F.R.E.") 408 governs the terms of the Proposed Settlement and that all references to the Proposed Settlement's provisions in the amended complaint should be stricken.  (*Id.* at 5–9.)  Defendants argue that "[o]nce the Settlement Paragraphs are stricken [from the amended complaint] . . . it is apparent that BTG has" not alleged facts sufficient to state a claim for relief.  (*Id.* at 9–10.)  Defendants also claim that even if the Court finds that BTG has alleged sufficient facts to state a claim, the amended

complaint can "be separately dismissed . . . because [the IPR petition] is protected by the *Noerr-Pennington* doctrine." (*Id.* at 14 (citation omitted).)

In response, BTG argues that the Court has personal jurisdiction over Defendants because they "directed several letters and e-mails to BTG personnel in Pennsylvania." (*Id.* at 23.) BTG further contends that it has pleaded sufficient facts to make out an abuse of process claim, that F.R.E. 408 permits use of the Proposed Settlement in its amended complaint and the *Noerr-Pennington* doctrine does not immunize Defendants. (Pl.'s Opp. to Defs.' Mot. ("Pl.'s Opp.") at 11–20, ECF No. 17.) The Court heard oral argument on the motion on June 21, 2016. (ECF No. 28.)

## II.

When reviewing a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (citation omitted). A motion to dismiss for lack of personal jurisdiction "is inherently a matter which requires resolution of factual issues outside the pleadings," *i.e.*, "whether *in personam* jurisdiction actually lies." *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984). When this defense is raised, "the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).

To meet this burden, the plaintiff must submit evidence that shows with reasonable particularity the existence of sufficient contacts between the defendant and the forum state to support jurisdiction. *See Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987). The plaintiff may not "rely on the bare pleadings alone;" rather, the plaintiff "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or

other competent evidence." *Time Share Vacation Club*, 735 F.2d at 66 n.9 (citing *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700 (3d Cir. 1982)).

Pursuant to Rule 4(e), a district court may exercise personal jurisdiction over defendants who are not residents of the forum state to the extent it would be permissible under that state's law. Pennsylvania's long-arm statute permits a court to exercise personal jurisdiction "to the fullest extent allowed under the Constitution of the United States and . . . based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). Therefore, in order to exercise personal jurisdiction over Darnell and Bioactive, the Court must determine whether, under the Due Process Clause, these defendants have "certain minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316–17 (3d Cir. 2007) (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).

## A.

The Due Process Clause recognizes two types of personal jurisdiction: general and specific. General jurisdiction is proper when a defendant's contacts with the forum state are "continuous and systematic," regardless of whether those contacts are related to the plaintiff's cause of action. *See Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). Specific jurisdiction exists when the "non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz*, 270 F.3d 144, 150 (3d Cir. 2001) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). In this case, BTG argues that the Court has both specific and general jurisdiction over the Defendants. (Pl.'s Opp. at 23–24.)

9

To show that specific jurisdiction exists, a plaintiff must satisfy three requirements. First, show that the defendant "purposefully directed his activities at the forum." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citing *Burger King Corp.*, 471 U.S. at 472) (internal quotation marks omitted). Under this requirement, "[p]hysical entrance is not required." *O'Connor v. Sandy Lane Hotel, Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (citing *Grand Entm't Group, Ltd. V. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendants into the forum may count toward the minimum contacts that support jurisdiction.")). "[C]ontacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself." *Id.* (citation omitted).

Second, the plaintiff must show that the claim "arise[s] out of or relate[s] to at least one of those specific activities." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)) (internal quotation marks omitted). In assessing the relatedness of the claim to the activities directed at the forum, some courts have employed a "but-for" causation standard. *Id.* at 319. That standard is satisfied "when the plaintiff's claim would not have arisen in the absence of the defendant's contacts." *Id.* (citation omitted). The Third Circuit Court of Appeals, however, has held that "specific jurisdiction requires a closer and more direct causal connection than that provided by the but-for test." *Id.* at 323. It stated that "[t]he causal connection can be somewhat looser than the tort concept of proximate causation, [ ] but it must nonetheless be intimate enough to keep the quid pro quo proportional and personal jurisdiction reasonably foreseeable." *Id.* (citation omitted). Third, as discussed *infra* Section II.B, a court may consider "additional factors to ensure that the assertion of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id.* (citing *Burger King Corp.*, 471 U.S. at 476) (internal quotation marks omitted).

In *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 623 (E.D. Pa. 2015), Vizant had its principal place of business in Pennsylvania. Defendants were two former employees at a Vizant office in Georgia. *See id.* After their termination, defendants made several threatening phone calls to the company and sent disparaging and intimidating letters and emails to Vizant leaders, board members and counsel. *See id.* at 625–27. Vizant initially sought to enjoin defendants' conduct by filing an action in Georgia state court. *See id.* at 626. After Vizant filed a notice of voluntary dismissal, defendants continued to make filings in that action and threatened Vizant officers in Pennsylvania through e-mails and letters. *See id.* at 626–27. Vizant then sued defendants in our Court alleging, among other things, abuse of process. Specifically, they alleged that the defendants' continued filings in the Georgia action were "made with the ulterior motive of furthering [their] efforts to extract money from Vizant and constitute the willful use of legal process that is not proper in the regular conduct of those legal proceedings." *Id.* at 634 (internal quotation marks omitted).

The court held that it had personal jurisdiction over defendants "under the traditional jurisdictional test." *Id.* The court stated that since defendants engaged in the litigation and threatened litigation "with the purpose of extorting money from Vizant, a Pennsylvania-based company, [ ] their conduct was 'purposefully directed' at Pennsylvania." *Id.* at 635 (citing *Marten*, 499 F.3d at 296). The abuse of process claim "ar[o]se out of or relate[d] to" the threats of litigation, directed at various company personnel in Pennsylvania, which furthered a "scheme . . . to extort money from Vizant." *Id.* at 635.

Here, Defendants purposefully engaged in conduct directed at this forum by sending letters to BTG in Pennsylvania threatening legal action and aiming "to extort money from BTG." (Am. Compl. ¶¶ 28–32.) The letters, which BTG attached to its amended complaint, are directly

related to Defendants' alleged extortion scheme and abuse of process through the filing of the IPR petition.  (*Id.*, Exs. A–C.)  In Darnell's February 26, 2014 letter to Gantz at BTG's Pennsylvania office, he states that BTG "puts out to the public . . . inaccurate information concerning venom supply" and that "[t]hese untrue statements constitute libel and are unacceptable."  (Am. Compl., Ex. A at 3–4.)  Darnell also said that if BTG "stonewalled" him, that "you will quickly find that I am not going to put up with the behavior some at BTG must consider appropriate and BTG will be held to account."  (*Id.* at 4–5.)

In the second letter sent to BTG's Pennsylvania office on September 15, 2014, Bowles refers to previous correspondence sent to BTG's parent company in London in which he accused BTG of engaging in "libelous and slanderous actions" based on the statements it made to distance itself from Darnell.  In his letter, Bowles writes: "I believe my letter . . . clearly sets out a cause of action and thus any further explanation appears to be unnecessary."  (*Id.*, Ex. C.)  He states that "[b]efore proceeding with legal action, I would like to know if BTG is interested in discussing a possible settlement . . . .  If so, I am prepared to extend a settlement proposal for your consideration.  If BTG is not interested in settlement negotiations, I have been authorized to proceed with legal action."  (*Id.*)  In addition to the February 16 and September 15, 2014 letters, Defendants mailed the Proposed Settlement to BTG in Pennsylvania.  (*Id.* ¶ 41.)

As in *Vizant*, the Defendants' actions here were made in continuance of its "scheme to extort money from" BTG and were "purposefully directed" at the forum.  *Vizant*, 97 F. Supp. 3d at 635; *see also Grand Entm't Grp., Ltd.*, 988 F.2d at 482 (holding that mail and telephone correspondence can count towards the minimum contacts analysis).

**B.**

If the Court determines that Defendants have met the test for minimum contacts, jurisdiction is presumed constitutional and the Defendants must come forward with "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *O'Connor*, 496 F.3d at 324 (citing *Burger King Corp.*, 471 U.S. at 477) (internal quotation marks omitted).  The factors that a court must consider are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies." *Id.*  In their motion, Darnell and Bioactive contend that litigating in Pennsylvania would be unduly burdensome since they are both domiciled in Alabama and that Pennsylvania has little interest in resolving the case since the underlying conduct—the filing of the IPR petition—took place in Virginia.  (Defs.' Mot. at 25.)  They also argue that BTG is a large corporation with an international presence and would not be burdened by litigating elsewhere.  (*Id.*)

Darnell and Bioactive have failed to make a "compelling case" to override the presumption of constitutionality that comes with a showing of minimum contacts.  Due process only requires a "reasonable"—not a "convenient" or the "best" forum.  *O'Connor*, 496 F.3d at 325 ("Pennsylvania may not be the best forum—it may not even be a convenient one.  But when minimum contacts exist, due process demands no more than a reasonable forum.").

Further, Defendants purposefully and voluntarily engaged in conduct directed at the forum.  *See Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co* ., 75 F.3d 147, 151 (3d Cir. 1996) ("Specific jurisdiction is invoked when the cause of action arises from the defendant's forum related activities [ ] such that the defendant should reasonably anticipate being haled into

13

court there.") (citations and internal quotation marks omitted).  Pennsylvania also has a legitimate interest in protecting its residents from the extortion allegedly perpetrated by out-of-state individuals and entities.  *See Penn Mut. Life Ins. Co. v. BNC Nat. Bank*, No. 10-00625, 2010 WL 3489386, at *6 (E.D. Pa. Sept. 2, 2010) (finding personal jurisdiction because "Pennsylvania has an interest in protecting the rights of its citizens from fraudulent misrepresentations by out-of-state actors").  Since Defendants have minimum contacts with the forum and exercising jurisdiction "comport[s] with fair play and substantial justice," the Court finds that it has personal jurisdiction.[3]

### III.

Federal Rule of Civil Procedure 12(f) provides that "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Motions to strike are disfavored and usually will be denied "unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case."  *River Road Dev. Corp. v. Carlson Corp. Ne.*, No. 89–7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990); *see also* 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1382 (3d ed. 2004) ("There appears to be general judicial agreement, as reflected in the extensive case law on the subject, that [Rule 12(f) motions] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.").

The standard for striking a complaint or a portion of a complaint is "strict and only allegations that are so unrelated to the plaintiffs' claims as to be unworthy of any consideration

---

[3]       Because the Court finds it has specific jurisdiction, it is unnecessary to determine whether general jurisdiction exists.

should be stricken." *Johnson v. Anhorn*, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004). Striking a complaint "is a drastic remedy to be resorted to only when required for the purposes of justice." *Id.* (citation and internal quotation marks omitted).

## A.

Defendants contend that F.R.E. 408 bars all reference to the Proposed Settlement in BTG's amended complaint and that such allegations should be stricken pursuant to F.R.C.P 12(f). (Defs.' Mot. at 6–9.) They argue that "BTG is unequivocally using the substance of the Proposed Settlement Term Sheet in an attempt to prove liability for its alleged abuse of process claim," which falls "squarely" within the scope of F.R.E. 408. (*Id.* at 5, 8.) Defendants contend that since F.R.E. 408 only allows the disclosure of settlement communications in "limited, specified [circumstances]," none of which are applicable here, the Court should grant its motion. (*Id.* at 8.)

BTG argues that F.R.E. 408 does not bar discussion of the Proposed Settlement in the amended complaint because it is being used for a permissible purpose. "BTG is not offering the term sheet, or the discussions among counsel surrounding the term sheet, to either 'prove or disprove the validity or amount' of any claim that was asserted in the IPR proceeding." (Pl.'s Opp. at 17.) Rather, BTG contends that it is using the Proposed Settlement "as evidence of an independent wrong, *i.e.*, the Defendants' use of their filing of the IPR petition to extort from BTG the payment of millions of dollars in so–called 'damages' for alleged claims entirely unrelated to the IPR proceeding." (*Id.*)

## B.

Federal Rule of Evidence 408 provides:

> (a) **Prohibited Uses**. Evidence of the following is not admissible—
> on behalf of any party—either to prove or disprove the validity or

amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

> (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) **Exceptions**. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Because it is "generally believed that settlement negotiations will be inhibited if the parties are aware their statements may later be used as admissions of liability," Rule 408 serves to protect the freedom of discussion during negotiations and encourage settlement. *Ciolli v. Iravani*, 625 F. Supp. 2d 276, 285 (E.D. Pa. 2009).

The application of the rule, however, "is limited to evidence concerning settlement or compromise of a claim, where the evidence is offered to establish liability, or the validity or amount of the claim." *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir. 1995). In the "paradigmatic Rule 408 case," for example, "a plaintiff who slipped and fell outside the defendant's home would be barred from introducing evidence that the defendant had offered to settle the case for $10,000." *Herman v. Allentown*, 985 F. Supp. 569, 577 (E.D. Pa. 1997). Without the protection of Rule 408, the plaintiff could "parlay" the defendant's offer "into proof of liability which would discourage the defendant from ever even considering settling the case." *Id.*

16

Rule 408 does not bar the introduction of settlement discussions if offered for "another purpose," such as to show a party's knowledge or intent.  FED. R. EVID. 408; s*ee Ciolli*, 625 F. Supp. 2d at 288 ("[I]t is true that courts will admit settlement evidence pursuant to FRE 408 for purposes of demonstrating knowledge or intent."); *Benson v. Giant Food Stores, LLC*, 2011 WL 6747421, at *5 (E.D. Pa. Dec. 22, 2011) ("However, the restriction of Rule 408 does *not* always apply.").  The Advisory Committee Notes to the Rule reflect an intent "to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim."  Fed. R. Evid. 408 advisory committee notes (2006) (collecting cases).  For example, "Rule 408 is inapplicable if offered to show that a party made fraudulent statements in order to settle a litigation."  *Id.*

The Third Circuit "has not expressly addressed the situation in this case in which a plaintiff seeks to introduce evidence of settlement negotiations in an action raising a claim different from the one that was the subject of the negotiations."  *Ciolli*, 625 F. Supp. 2d at 287. Identifying a situation in which F.R.E. 408 prohibits settlement discussions from a previous case is "necessarily a *sui generis* determination."  *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1035, 1039 (D.N.J. 1995) (granting a motion to strike references to settlement in underlying action because "where the same parties are involved, or the same set of facts give rise to the claim, it may weigh in favor of a determination that the cases are too closely related to permit a settlement proposal in one to be admitted in the other").

Defendants rely on *Ciolli* to support their position that BTG is using the Proposed Settlement for a prohibited purpose under F.R.E. 408.  (Defs.' Mot. at 7–9.)  In that case, Anthony Ciolli sued Heidi Iravani and her attorneys for abuse of process and wrongful initiation of civil proceedings.  *Ciolli*, 625 F. Supp. 2d at 281–83.  Iravani had sued Ciolli in district court

in Connecticut over harassing internet posts. *Id.* During negotiations in that lawsuit, Iravani's counsel told Ciolli's lawyers, among other things, that they wanted "nothing from Ciolli but only wanted concessions from [another defendant] in exchange for Ciolli's dismissal." *Id.* at 284 (internal quotation marks omitted). Ciolli alleged that defendants were "using [him] as a hostage in order to secure a deal," and included the substance of those settlement negotiations in the complaint he filed in our Court.[4] *Id.* at 284–85.

The defendants sought to strike portions of Ciolli's complaint, arguing that F.R.E. 408 barred Ciolli's use of the settlement discussions. *Id.* at 285. The court granted the motion, holding that F.R.E. 408 prohibited inclusion of settlement discussions in the complaint because "Ciolli's claims . . . are essentially causes of action asserting the invalidity of the claims in the Connecticut Litigation." *Id.* at 288. The court stated that "Ciolli is attempting to use evidence of settlement negotiations to prove the invalidity of the negotiated claim, albeit in support of his allegations in this case." *Id.* Relevant to the court's holding was that "Ciolli's wrongful initiation of civil proceedings and abuse of process claims [were] sufficiently related to the Connecticut Litigation as to require the inadmissibility of settlement evidence from that suit." *Id.* at 287–88.

The court rejected Ciolli's argument that he was using the evidence for a permissible purpose—"namely, to establish the intent, motivation, knowledge state of mind, and good faith of Defendants"—because it found instead that he was "merely attempting to repackage evidence that is so obviously related to liability in order to skirt the bounds of FRE 408." *Id.* The court also stated that exclusion is "preferred" when the applicability of F.R.E. 408 is "a close call." *Id.*

---

[4]      Ciolli initially filed his complaint in the Philadelphia County Court of Common Pleas. *Ciolli*, 625 F. Supp. 2d at 282. Defendants removed to our Court on diversity grounds. *Id.*

In *Benson v. Giant Food Stores, LLC*, 2011 WL 6747421, at *6 (E.D. Pa. Dec. 22, 2011), defendants filed a motion for attorneys' fees and expenses because of plaintiffs' "unreasonable and vexatious conduct" during a lawsuit in which a jury ultimately found in defendants' favor. In support of their motion, defendants relied on statements that plaintiffs made during the settlement discussions, including certain written statements made in a "settlement brochure." *Id.* at *2–3. Plaintiffs "rel[ied] heavily on *Ciolli*" to support their argument that the court should not consider such settlement discussions. *Id.* at *6.

The court disagreed, holding that *Ciolli* "is distinguishable." *Id.* It stated that "Rule 408 does not provide a blanket protection against any and all use of statements made during settlement negotiations." *Id.* Rather, Rule 408 only bars those statements used to "prove liability for . . . a claim that was disputed."[5] *Id.* at *5. The settlement discussions in *Benson* did not relate to liability in the underlying action but instead were "being offered as evidence of a fraudulent statement by a party in order to settle litigation; therefore, the Rule does not require exclusion of the evidence." *Id.* (citing *Inline Connections Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 440 (D. Del. 2007); FED. R. EVID. 408 advisory committee notes (2006)). Thus, the critical inquiry in assessing the admissibility of settlement discussions is whether the "abuse of process [allegations] are essentially causes of action asserting the invalidity of the claims in the [underlying action]," *Ciolli*, 625 F. Supp. 2d at 288, or are instead "being used to prove something completely different." *Herman*, 985 F. Supp. at 577 (holding that admission of

---

[5]     Although the text of Rule 408 has changed slightly since *Benson* was decided in 2011, the Advisory Committee did "no[t] inten[d] to change any result in any ruling on evidence admissibility." FED. R. EVID. 408 advisory committee notes (2011). The changes were "stylistic only" and were done to make the Rule "more easily understood." *Id.* Specifically, the Advisory Committee revised the Rule in 2011 to replace "liability for . . a claim" with "validity . . . of a disputed claim," which it stated "makes the Rule flow better and easier to read." *Id.* "No change in current practice or in the coverage of the Rule [was] intended." *Id.*

settlement discussions were permissible because they were being used as evidence of discrimination, not as evidence of the validity of the underlying claim).

*Benson* is more applicable to the facts of this case than *Ciolli.* Rule 408 should not be read to effectively immunize Darnell and Bioactive from their alleged conduct in the IPR process. Such an interpretation would not only contravene Rule 408's text, but also could allow a party to easily insulate itself from an abuse of process claim by labeling as settlement discussions its purportedly improper and possibly illegal demands.[6] *Id.* Here, BTG does not reference the Proposed Settlement in its amended complaint "either to prove or disprove the validity . . . of a disputed claim," FED. R. EVID. 408, *i.e.*, to demonstrate the invalidity of the underlying IPR petition by demonstrating the legitimacy of its '414 Patent. Indeed, an abuse of process claim is not dependent on whether the underlying litigation involved a valid claim. *See Lerner v. Lerner*, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008) (citation omitted) (stating that the elements of abuse of process in Pennsylvania are: (1) defendant used a legal process; (2) to accomplish a purpose for which the process was not designed; and (3) harm has been caused to plaintiff as a result). Rather, BTG includes the terms of the Proposed Settlement as evidence of Defendants' improper use of the IPR proceeding. *See Providence Town Ctr. LP v. Raymours Furniture Co.,* No. 09-3902, 2009 WL 3821935, at *4 (E.D. Pa. Nov. 13, 2009) (stating that settlement negotiations may be admitted to show "knowledge, intent, or good faith") (citation omitted).

Defendants rely on the policy rationale underpinning F.R.E. 408 to support their argument that the Court should strike all references to the Proposed Settlement terms. (Defs.' Mot. at 8; Oral Arg. 36:17–25.) Defendants cite to the statement in *Ciolli* that "[i]f parties were

---

[6]    Indeed, Defendants in this case labeled their Proposed Settlement as "Confidential Subject to F.R.E. 408." (Am. Compl., Ex. F)

permitted to take the content of these negotiations and use them in subsequent litigation for wrongful initiation of civil proceedings or abuse of process, then counsel would put themselves and their clients at risk of suit in every settlement conference in which they participate . . . ." (Def.'s Mot. at 8 (citing *Ciolli*, 625 F. Supp. 2d at 288).)

While a purpose of F.R.E. 408 is to allow parties to engage in frank discussion about their claims or defenses, FED. R. EVID. 408 advisory committee notes (1972), the Advisory Committee's desire to encourage settlement does not override the Rule's express statement that settlement discussions are permissible in some circumstances, *e.g.*, if they are offered for a purpose other than to prove liability or the validity of an underlying claim.  FED. R. EVID. 408. Defendants' argument prioritizes a purpose of the Rule over its text, eviscerating the line between permissible and impermissible uses of settlement discussions.

Further, Defendants contend that pursuant to *Ciolli*, the Proposed Settlement should be stricken because "the IPR petition is directly related to [the] abuse of process claim."  (Oral Arg. 51:19–20.)  Whether two actions are "related," however, is not dispositive of whether F.R.E. 408 bars the settlement discussions—indeed, an abuse of process claim will always be "related" to some extent to the underlying claim.

The court in *Ciolli* cited to *Herman* for the proposition that the "relatedness of the actions [is] important in determining whether settlement evidence from one [action] could be admitted in the other."  625 F. Supp. 2d at 287 (citation omitted).  *Herman*, however, involved a discrimination claim, not an abuse of process claim.  *Id.* at 570–74.  Further, the court in *Herman* only discussed the "relatedness" of the actions as way to assess whether plaintiff was using the settlement discussions to prove the validity of the underlying claim pursuant to Rule 408(a): "The settlement agreement relates to the Plaintiff's original termination.  The [present] lawsuit

relates to the Defendant's failure to rehire the Plaintiff.  Thus, the settlement is not being offered into evidence to prove the validity of the claim that it settled." *Id.* at 577.

While Defendants correctly state that the admissibility of settlement discussions in one lawsuit cannot be used in another if the two actions are "sufficiently related," 625 F. Supp. 2d at 287–88, "relatedness" is not a separate standard to measure the admissibility of settlement discussions from the one provided by F.R.E. 408.   It is merely a way to evaluate whether or not the settlement discussions are being used to establish liability in the underlying action.

Since BTG uses the Proposed Settlement terms to show Defendants' alleged improper use of the IPR petition, not as evidence of the petition's invalidity, Rule 408 does not require exclusion of the settlement discussion.

## C.

Rule 408 "is a rule of evidence and does not govern pleadings." *Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, No. 09-2857, 2009 WL 3540786, at *3 (E.D. Pa. Oct. 29, 2009).  Thus, even if the Proposed Settlement were inadmissible under F.R.E. 408, "it is not so irrelevant as to warrant striking any part of [BTG's] complaint." *Id.*; *see also Horse Soldier, LLC v. Tharpe*, No. 13-2892, 2014 WL 5312823, at *7 (E.D. Pa. Oct. 17, 2014) ("Assuming *arguendo* that Horse Soldier's averments . . . fall within the scope of Rule 408, the court declines to apply the rule at this juncture.  Such argument must be resolved at later stages of litigation.").  A number of courts have held that it is inappropriate to strike settlement material pursuant to F.R.C.P. 12(f) because such allegations are not "immaterial, impertinent [or] scandalous." *See, e.g.*, *Horse Soldier, LLC*, 2014 WL 5312823, at *8; *Providence*, 2009 WL 3821935, at *5; *but see Ciolli*, 625 F.Supp.2d at 284–89; *Bergman v. Jefferson-Pilot Life Ins. Co.*, No. 03-4459, 2003 WL 23142155, at *1 (E.D. Pa. Dec. 30, 2003).

## VI.

Defendants largely predicate their motion to dismiss for failure to state a claim on the presumption that the Court will grant the motion to strike the references to the Proposed Settlement: "Once the Settlement Paragraphs are stricken . . . it is apparent that BTG has neither plead facts sufficient to raise a right to relief above the speculative level nor alleged enough facts to state a claim to relief that is plausible on its face for abuse of process under Pennsylvania law." (Defs.' Mot. at 10–11.)  During oral argument, however, counsel maintained that even if the amended complaint was considered in its entirety, BTG has still not pleaded sufficient facts to state a claim for abuse of process.  (Oral Arg. 19:24 –22:5.)

### A.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The "mere possibility of misconduct" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The court must construe the complaint in the light most favorable to the plaintiff.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted).  A court should "consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."  *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  Whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).

Under *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.  *See Connelly*, 809 F.3d at 787.  First, it must "tak[e] note of the elements [the]

23

plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Second, it should

identify allegations that, "because they are no more than conclusions, are not entitled to the

assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Finally, "[w]hen there are well-

pleaded factual allegations, [the] court should assume their veracity and then determine whether

they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

### B.

To establish a claim for abuse of process, BTG must demonstrate: (1) Defendants used a

legal process against it; (2) primarily to accomplish a purpose for which it was not designed; and

(3) BTG has been harmed as a result. *Lerner*, 954 A.2d 1229 (citing *Shiner v. Moriarty*, 706

A.2d 1228, 1236 (Pa. Super. Ct. 1998), *appeal denied*, 729 A.2d 1130 (1998)).  "The gravamen

of abuse of process is the perversion of the particular legal process for a purpose of benefit to the

defendant, which is not an authorized goal of the procedure." *Id.*

In evaluating the primary purpose prong of an abuse of process claim, "there must be an

act or threat not authorized by the process, or the process must be used for an illegitimate aim

such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action."

*Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 192 (Pa. Super. Ct. 1994) (citation

omitted).

In its amended complaint, BTG sets forth the history between it and Defendants prior to

the filing of the IPR petition.  The amended complaint details the multiple letters sent by Darnell

or on his behalf to BTG, alleging it of "libelous and slanderous actions."  (Am. Compl. ¶¶ 29–

32.)  After failing to get the response he was seeking, Darnell initiated the IPR proceeding

"primarily . . . to coerce and extort from BTG public recognition for Darnell . . . payments

totaling $9.35 million, and other redress for alleged defamation, slander, libel and business tort

24

claims."  (*Id.* ¶ 47.)  BTG alleges that the true purpose of an IPR proceeding is to provide an

alternative to challenge the "patentability of one or more claim," not to provide parties with

"tools for harassment."  (*Id.* ¶ 35 (citation omitted).)

Defendants' counsel's allegedly sarcastic comments to BTG's counsel about the reasons

for initiating the IPR proceeding—*i.e.*, "to benefit the public by taking down a bad patent"—

suggest that the IPR petition "ha[d] nothing to do with the '414 Patent claims and everything to

do with using the expense and inconvenience of defending an IPR proceeding."  (*Id.* ¶ 40.)  BTG

alleges that the Proposed Settlement, which "makes no reference to any of the specific claims of

the '414 Patent," also demonstrates "[t]he extortionate nature of the IPR proceeding."  (*Id.* ¶¶ 41,

43.)  BTG has accordingly alleged sufficient facts to demonstrate that Defendants were using the

IPR petition for an improper purpose—specifically, "as a threat and a club to extort and coerce

millions of dollars of alleged compensatory damages and other redress from BTG that is simply

unavailable in an IPR proceeding for unrelated defamation, slander, libel and business tort

claims."  (*Id.* ¶ 38); *see Triester v. 191 Tenants Ass'n*, 415 A.2d 698, 702 (Pa. Super. Ct. 1979)

("The classic example [of an abuse of process claim] is the initiation of a civil proceeding to

coerce the payment of a claim completely unrelated to the cause of action sued upon.").

Defendants' contend that the amended complaint fails to state a claim because they "have

standing to file an IPR directed to BTG's '414 Patent, and the petition is proper."  (Defs.' Mot. at

11.)  Whether or not Defendants' had standing to file the IPR petition is irrelevant to whether or

not they used that process for an improper purpose.  Defendants further contend that the

Proposed Settlement is similar to other settlement offers in patent disputes because such claims

"are often resolved with other business concessions, and it is naïve of BTG to assert

[otherwise]." (*Id.* at 14.)  The propriety of the Proposed Settlement, however, is not an issue appropriately resolved at this stage of the litigation.

## V.

Lastly, Defendants contend that the Court could "separately dismiss[]" BTG's amended complaint because Defendants' filing of the IPR petition was protected by the *Noerr-Pennington* doctrine.  (Defs.' Mot. at 14–17.)  They argue that pursuant to that doctrine, government petitions such as the IPR petition "are immune from claims such as abuse of process unless the challenged action is established to be a sham." (*Id.* at 15.)  They contend that since "the IPR petition is not a sham, Bioactive's actions are protected by the *Noerr-Pennington* doctrine." (*Id.* at 17.)

BTG argues that the filing of the IPR petition was a sham because Defendants instituted that proceeding "without probable cause and regardless of the merits of the case." (Pl.'s Opp. at 13 (citing *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (internal quotation marks omitted).)  It contends that since it has included sufficient factual allegations to establish that the filing of "the IPR proceeding was objectively baseless and designed to harm BTG," the *Noerr-Pennington* doctrine does not shield Defendants from liability.

The *Noerr–Pennington* doctrine is premised on the First Amendment right to petition the government and originated with the United States Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).  The doctrine "protects parties who petition the government for redress from claims arising in response to that petitioning." *Tr. of U. of Pa. v. St. Jude Child. Res. Hosp.*, 940 F. Supp. 2d 233, 239 (E.D. Pa. 2013) (citations omitted).  The

26

Supreme Court of the United States has stated that the doctrine does not protect the party if the initiation of the action "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of [another] . . . ." *Noerr*, 365 U.S. at 144.  Though *Noerr–Pennington* immunity arose in the antitrust context, the Third Circuit has extended the doctrine to other areas.  *See We, Inc. v. City of Phila.*, 174 F.3d 322, 326–27 (3d Cir. 1999).

In *Columbia Pictures*, the Supreme Court articulated a two-pronged test to determine if a party's conduct constituted a "sham."  First is the objective test, which is met if the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  508 U.S. at 60.  An action is "objectively baseless" if the litigant did not have probable cause to initiate the legal proceedings.  *St. Jude Child. Res. Hosp.*, 940 F. Supp. 2d at 245.  The court only proceeds to the second prong if the objective test is met.  *See Columbia Pictures*, 508 U.S. at 60.  The second prong—a subjective test—is met if the lawsuit "conceals an attempt to interfere *directly* with the business relationships of [another] through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as a[ ] weapon."  *Id.* at 60–61 (citations and internal quotation marks omitted).  In essence, the sham exception applies when it can be shown that a defendant "is simply using the petition process as a means of harassment."  *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 413 (E.D. Pa. 1998).

Whether a petition is a sham "is generally a question of fact for the jury[.]"  *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011) (citations omitted); *see also Kravco Co. v. Valley Forge Ctr. Assocs.*, No. 91-4932, 1992 WL 97926, at *3 (E.D. Pa. Apr. 30, 1992) ("Whether or not the acts of the defendants fit the sham exception is a factual issue . . . .").  A court should only rule on the objective baselessness prong as a matter of law "[w]here there is no dispute over the predicate facts of the underlying [petitions]."  *Columbia Pictures*, 508 U.S. at

27

60–61.  The burden falls on the party invoking the exception to show that the conduct constitutes a sham.  *In re Flonase*, 795 F. Supp. 2d at 311.

Courts have denied motions to dismiss where a plaintiff alleges sufficient facts in the complaint to show that the filing of the underlying action was a sham.  *See, e.g.*, *Rochester Drug Co-op., Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308, 321 (D. Del. 2010) (denying motion to dismiss because certain elements of *Noerr-Pennington* are "better addressed at the summary judgment stage upon a developed record"); *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 331 (E.D.N.Y. 2009) (denying motion to dismiss because plaintiff alleged that "the litigation was both subjectively and objectively baseless and plausibly supports this claim with the assertion that there could be no valid patent claim").

BTG alleges that in his April 21, 2014 letter Darnell stated that he "ha[s] no information concerning the validity of the BTG patent in question."  (Am. Compl. ¶ 39, Ex. E.)  BTG further alleges that Defendants' "meritless IPR petition . . . is virtually identical (including original typos) to an IPR petition challenging BTG's '414 Patent filed by a BTG competitor . . . and terminated pursuant to a settlement."  (*Id.* ¶ 34.)  As further evidence of a sham BTG relies upon the terms of the Proposed Settlement, which are unrelated to the '414 Patent, and cites to the PTAB's denial of Defendants' IPR petition.  (Pl.'s Dec. 14, 2015 Letter, ECF No. 22.)  In that opinion, the PTAB stated that it was "not persuaded that [Bioactive] has established a reasonable likelihood that it would prevail" on any of its 22 claims.  (*Id.*)

When viewed in the light most favorable to BTG, these facts are sufficient to establish that Defendants' initiation of the IPR petition was a sham.  *See Rochester Drug Co-op.*, 712 F. Supp. 2d at 321 ("The court is satisfied that plaintiffs have alleged facts sufficient to establish that Braintree's suit . . . was both objectively and subjectively baseless.").  Though Defendants

provide a number of responses to BTG's allegations, they are factually disputed and are not properly dealt with at this stage of the case.  They contend, for example, that: (1) they had a legitimate business reason for filing the IPR petition, (Oral Arg. 57:3–18); (2) the Proposed Settlement terms are normal negotiating terms in IPR proceedings because changes to the patent itself "are only negotiated between the patent owner and the USPTO," (Defs.' Reply at 5–6, ECF No. 18); and (3) they did not just copy and refile an IPR petition, but added a number of new claims.  (Oral Arg. 11:22–12:2.)

BTG contests each of those assertions.  Accordingly, they are issues that are best resolved after the parties have taken discovery and presented to the Court at summary judgment with a complete record or to a jury at trial.

An appropriate Order follows.


_/s/ Gerald J. Pappert_
GERALD J. PAPPERT, J.